CALABRIA, Judge.
Dawayne David Knolton ("defendant") appeals from judgments entered upon his convictions on seven counts of sexual offense with a child by an adult. For the following reasons, we conclude the trial court committed no error.
I. Background
Defendant was arrested on 5 September 2012 based on allegations that he sexually abused his minor daughter, Kerry,[1] who was ten years old at the time of defendant's arrest. On 22 April 2013, the Scotland County Grand Jury indicted defendant on sixty counts of first-degree sex offense with a child by an adult in violation of N.C. Gen. Stat. § 14-27.4A. Sixteen counts remained when trial began on 7 December 2015 in Scotland County Superior Court, the Honorable Michael E. Beale, Superior Court Judge, presiding.
The evidence presented at trial tended to show that defendant's daughter, Kerry, experienced repeated acts of sexual assault, perpetrated by defendant, starting when she was six years old. Defendant called these acts "the game," and would have Kerry play "the game" with him on various occasions.
Kerry understood that when they played "the game," she would "go in the room ... and I get on all fours or on my back or however he told me to, and he'll get behind me or however I am, and he'll pull my pants down, and he'll pull his down, and he'll put his private in my butt."
Defendant would have Kerry play "the game" when she wanted something. Defendant would occasionally lubricate himself when they played "the game."
Kerry's mother only became aware of the situation after several years of sexual interactions between defendant and his daughter. A boy "lied and told [Kerry's] mom that [they] did it[ ]" and when Kerry's mom threatened to take her to the hospital to be examined, Kerry decided to tell her mom about what had been going on with her dad.
At the hospital on 12 August 2012, Kerry was interviewed by medical staff and several members of law enforcement, and was eventually referred to a hospital in Fayetteville with specialists in child sexual abuse. There, she saw Dr. Danielle Thomas-Taylor, who performed a child medical evaluation on 5 September 2012.
Nurse Mary Fong testified at trial that, pursuant to a search warrant, she collected a urine sample from the defendant at the Scotland County Detention Center on 24 October 2012. The sample was packaged for transport and eventually sent to LabCorp for analysis.
Dr. Thomas-Taylor was called as a witness for the State on 10 December 2015 and testified that she completed two fellowships-one in general academic pediatrics, and another in child abuse and forensic pediatrics. Dr. Thomas-Taylor testified that she is board certified in child abuse pediatrics. In her role at Southern Regional Area Health Education Center in which she encountered the alleged victim, she conducted pediatric evaluations based on reliable principles and methods used in the field.
The court allowed Dr. Thomas-Taylor to testify as an expert in the field of pediatrics and forensic child-abuse pediatrics. Prior to the continuation of Dr. Thomas-Taylor's testimony, the trial court gave the jury several limiting instructions. Statements made by the alleged victim to Dr. Thomas-Taylor, if made for the purpose of medical diagnosis and treatment, were permitted. The admissibility of Dr. Thomas-Taylor's expert testimony is of central importance on appeal.
Dr. Thomas-Taylor testified that as part of her medical evaluation of Kerry she took a patient history, in which Kerry disclosed the existence of a history of anal penetration by her father. The patient reported that her father would sometimes use products such as lotion, cocoa butter, and hair gel, which he would put on his privates and then also on hers. Dr. Thomas-Taylor testified that the alleged victim told her that "she did have pain when she went to the bathroom afterward, when she peed."
Dr. Thomas-Taylor conducted a physical exam and testified that the genital exam of the patient was normal. The doctor testified that she collected vaginal and anal swabs and a urine sample.
Dr. Thomas-Taylor began to clarify the results of the genital exam when the defense objected. Outside the presence of the jury, Dr. Thomas-Taylor previewed her testimony that a normal genital exam does not rule out abuse, and it is clear from the transcript that the parties understood that the doctor would testify at that point only to that effect. During the discussion, the trial judge explained, "I'm not going to allow her to testify without physical evidence she has the opinion she's been sexually abused." The judge further explained, "[a]nd ... she can only get to that if in fact this chlamydia evidence comes in. And even then, I'm not sure if it comes in."
Dr. Thomas-Taylor testified in the presence of the jury that there are "several reasons why there may not be signs of trauma or physical findings in someone who has been anally penetrated." Those reasons include the use of lubrication, the size of the part inserted, the resistance of the victim, the timing of the exam relative to the incident, and the anatomy of the anus, which stretches to accommodate large bowel movements.
Defense counsel objected when the State asked the doctor to describe the characteristics of sexually abused children, and the jury was again excused. During voir dire , the State probed the doctor regarding the characteristics of children that are sexually abused. The State then asked, "Did you form an opinion in this case to whether [Kerry] displayed characteristics consistent with those of a sexually abused child?" The doctor began to respond, but was prompted by the court to answer "yes or no." The State rephrased the question and asked if the doctor formed an opinion; the doctor replied in the affirmative. When asked what the opinion was, the doctor replied, "My opinion is that she has been sexually abused." She then explained the opinion was based "on the characteristics, the information that has been provided, the history, and physical examination that [she] performed, yes."
At that point, the court then explained that it would "sustain the objection if she's going to testify there's been sexual abuse and-as she just said. That's not permissible." The State then explained that it hoped to elicit the testimony that Kerry's characteristics "are consistent with a child who's been sexually abused." After continued deliberations among the parties and the bench, the court summarized defendant's concerns: "So, you're contending, one, she doesn't-under Daubert , she hasn't met the standard, and, two, that even if she has, you haven't been furnished this through the protocol?"
Defendant affirmed, and the court said "I think I'm going to sustain the objection until we find out evidence about this chlamydia. Okay?" After a short break and reviewing some papers regarding the doctor's protocol, the court explained, "at this point, I'm going to sustain the objection but reserve the right to revisit it after evidence is presented from the lab."
Dr. Thomas-Taylor was then released and a laboratory director from LabCorp was called to the stand. The director, Dr. Melinda Nye, was tendered as an expert in the field of medical technology and medical microbiology. Dr. Nye testified during voir dire that chlamydia is a bacterium not normally found on the body and it is "only a pathogen that would be found in the genital tract as a result of sexual contact."
The parties had another lengthy discussion about whether Dr. Nye could testify as to the results of tests LabCorp performed on the urine samples of defendant and the alleged victim which showed that both tested positive for chlamydia. The court determined the records were admissible as business records. The court explained Dr. Nye could testify about LabCorp's procedures[2] but would not be able to offer any opinion testimony.
Defense counsel argued that certain documents only recently made available to him constituted a discovery violation. The court responded that it would not allow Dr. Nye to give any opinion, reiterating that her testimony would be about LabCorp's analysis, procedures, and machinery, and that "[the court is] not going to let her give her opinion that it's chlamydia."
The State then asked for clarification on what Dr. Thomas-Taylor would be allowed to testify to "as far as the results she received from LabCorp[.]" The court replied, "She's going to be allowed to testify what the-what you put on through this witness.... And then I'll let you revisit the opinion evidence that I excluded earlier[,]" referring to that of Dr. Thomas-Taylor.
The defense brought a case to the court's attention, which the trial judge apparently reviewed over lunch. After continued discussion, defense counsel entered a written objection and motion to strike. Additional discussion ensued, and the State clarified the parameters of Dr. Nye's testimony: "My understanding was that you were going to allow her to testify-Dr. Nye to testify as to the results generated by the machine." To this, the court replied, "Right."
There was some additional back-and-forth as to whether Dr. Nye could testify to the original LabCorp report, subsequently destroyed, but copied in Dr. Thomas-Taylor's medical notes with regard to the alleged victim. In response to defense counsel's contention that he was entitled to prior notice of this testimony, the court explained: "I ruled before lunch: I'm not going to let her give her opinion, because she" and then, "I'm going to-I'll allow her to testify about the findings from the machines and how that's done." The trial judge reiterated: "She's going to testify as to the findings, that the machine found it to be chlamydia. Isn't that what she testified before lunch about? And she said that it was no-it was all done by machines. They feed it in there. I'm going to let her testify as to how all that's done."
Defense counsel later clarified the parameters of Dr. Thomas-Taylor's opinion, inquiring whether she "will be able to testify regarding the characteristics [.]" The court explained: "She can-with a finding of chlamydia, she might be able to testify that the child's been sexually abused. I don't know what her testimony's going to be-medical testimony's going to be in regards to that.... I'll have to cross that bridge when we get there. But at the very least, that's probably sufficient to give her the characteristics[.]" Defense counsel and the court continued to discuss this, clarifying that Dr. Thomas-Taylor would be able to testify that she received a test result from LabCorp that it was chlamydia, and "then she can use that for any opinions that the State wants to ask her about."
During this discourse, the trial judge mentioned that Dr. Thomas-Taylor may testify that chlamydia is only transmitted sexually, which the judge thought she had testified to on voir dire . The State clarified that Dr. Nye offered that assertion. After additional Confrontation Clause arguments, the court once again clarified: "I'm going to let LabCorp identify it as chlamydia. And then she's going to testify, I assume, that she got that result and that she can use that evidence in making her-giving her opinion about sexual abuse, or at least the characteristics of sexual abuse." The judge noted the prohibition against "letting a doctor testify about sexual abuse when the only evidence they've got is what the-what the victim tells them, because you're basically testifying as to the credibility of the witness, and that's improper."
The court then offered to the defense counsel, "If you want, when she gets back on the stand, you can just note your exception on the record, or I can put it-I can-before I even start the examination, I'll overrule your objection and you note the exception. Okay?" Defense counsel replied affirmatively. Afterwards, Dr. Nye retook the witness stand, and defendant and the court noted an overruled objection and the defense's objection.
Dr. Nye testified as to LabCorp's procedures and machinery and that the result of defendant's urine sample was positive for chlamydia and negative for gonorrhea. Dr. Nye testified similarly as to the handling of the alleged victim's sample, and that her test result was also positive for chlamydia and negative for gonorrhea.
Once the jury heard the test results, the court altered its treatment of the defendant's objection to Dr. Thomas-Taylor's expert testimony.
Dr. Thomas-Taylor retook the stand and testified that she formed an opinion as to whether Kerry displayed characteristics that are consistent with those of sexually abused children. Defense counsel objected when the State asked what aspects of the medical evaluation Dr. Thomas-Taylor relied on in forming her opinion.
Dr. Thomas-Taylor explained that she generates her medical opinion by relying on the medical history, the physical exam, and the test results. Here, she relied on the information Kerry provided her about "the types of contact that she described and was able to detail." She noted discomfort and pain with urination, and described details that are "not necessarily age-appropriate [ ]" such as something white and lotion-like that was on the floor or her father's private part after the abuse.
With regard to the physical exam, Kerry described anal discomfort and pain when she went to the bathroom to pee that "was the result of lotions that had been applied to that area." Dr. Thomas-Taylor also noted the positive test result for chlamydia. She also testified that chlamydia is a "sexually transmitted infection. When you are someone her age, that is the way that it is transmitted. To be found in your urine or-is indicative of sexual contact or contact with bodily secretions in that area."
When asked whether, in her opinion, Kerry displayed any characteristics consistent with those of sexually abused children, Dr. Thomas-Taylor stated "She did." The State then reiterated: "Is that your opinion?" To this, Dr. Thomas-Taylor replied, "That is my opinion, yes, based on my medical evaluation, her history, the physical examination, her lab results, yes, that she was sexually abused. " (Emphasis added). Defense counsel objected to this testimony, and the court overruled the objection.
At the close of the State's evidence, the court granted defendant's motion to dismiss two of the counts, leaving fourteen remaining.
Defense counsel renewed the previous motions to exclude the results of the LabCorp tests for both defendant and the alleged victim. The court denied the motion. Defendant then requested a limiting instruction for the jury on expert opinion testimony. Defendant declined to present any evidence.
At the conclusion of the trial, the jury returned verdicts finding defendant guilty of seven counts of sexual offense with a child. Prior to sentencing, defense counsel renewed his previous objections. On 15 December 2015, judgments were entered upon the convictions sentencing defendant to terms totaling 1220 to 1593 months' imprisonment, with credit for time served. Defendant gave notice of appeal in open court.
II. Discussion
On appeal, defendant argues that expert opinion testimony that Kerry was sexually abused was admitted in error. Defendant also argues that if he did not preserve the issue for appeal, then the admission should be reversed as "plain error." Defendant lastly contends that, in the event the previous arguments are unsuccessful, he has been denied the effective assistance of counsel.
A. Expert Opinion Testimony
The essential question is whether there is physical evidence of abuse sufficient for Dr. Thomas-Taylor to testify that Kerry had in fact been abused, or if her testimony should have been constrained to merely explaining that Kerry exhibited characteristics consistent with children that have been sexually abused. Because there was sufficient physical evidence to permit Dr. Thomas-Taylor's expert opinion testimony that Kerry had, in fact, suffered abuse. We hold the trial court did not err in the admission of her testimony.
If "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert ... may testify thereto in the form of an opinion...." N.C. Gen. Stat. § 8C-1, Rule 702(a) (2015). However, "[e]xpert opinion testimony is not admissible to establish the credibility of the victim as a witness." State v. Dixon , 150 N.C. App. 46, 52, 563 S.E.2d 594, 598, per curiam aff'd , 356 N.C. 428, 571 S.E.2d 584 (2002). Nonetheless, the fact that evidence may support the credibility of a victim "does not alone render it inadmissible." State v. Kennedy , 320 N.C. 20, 32, 357 S.E.2d 359, 367 (1987).
In applying Rule 702, "the trial court is afforded wide discretion and will be reversed only for an abuse of that discretion." State v. Anderson , 322 N.C. 22, 28, 366 S.E.2d 459, 463 (1988). Yet there is abundant case law addressing the question of expert opinion testimony in child sexual abuse cases.
In such cases, expert testimony is admissible upon a proper foundation, "with respect to the characteristics of sexually abused children and whether the particular complainant has symptoms consistent with those characteristics." Dixon , 150 N.C. App. at 52, 563 S.E.2d at 598 (citing State v. Stancil , 355 N.C. 266, 559 S.E.2d 788 (2002) ). Furthermore, "an expert medical witness may render an opinion pursuant to Rule 702 that sexual abuse has in fact occurred if the State establishes a proper foundation[.]" Id .
Our courts have decreed that an expert opinion that a child victim has in fact been sexually abused requires the State to lay a sufficient foundation, which requires physical evidence consistent with sexual abuse. "[I]n the absence of physical evidence to support a diagnosis of sexual abuse, expert testimony that sexual abuse has in fact occurred is not admissible because it is an impermissible opinion regarding the victim's credibility." Id .; cf. Dixon , 150 N.C. App at 54-55, 563 S.E.2d at 599-600 (Campbell, J., dissenting) (arguing that a proper foundation requires clinical evidence, which is not limited to physical evidence). The practical effect of this distinction is that our courts will not permit expert testimony that sexual abuse has in fact occurred when the diagnosis is based solely on the alleged victim's history or on physical evidence that is "not diagnostic nor specific to sexual abuse." State v. Couser, 163 N.C. App. 727, 730, 594 S.E.2d 420, 422 (2004).
Defendant now contends that Dr. Thomas-Taylor's testimony that sexual abuse had occurred lacked the necessary foundation and was thus admitted in error.
As our Supreme Court has illustrated, "[w]hether sufficient evidence supports expert testimony pertaining to sexual abuse is a highly fact-specific inquiry." State v. Chandler , 364 N.C. 313, 318, 697 S.E.2d 327, 331 (2010). "Before expert testimony may be admitted, an adequate foundation must be laid. And for expert testimony presenting a definitive diagnosis of sexual abuse, an adequate foundation requires supporting physical evidence of the abuse." Id. at 319, 697 S.E.2d at 331 (citations omitted).
In State v. Hammet , our Supreme Court clarified that expert opinion testimony that abuse had in fact occurred was permissible when the opinion was based on the "interlocking factors of the victim's history combined with the physical findings." 361 N.C. 92, 96, 637 S.E.2d 518, 521 (2006). In that case, the expert testified that she observed a "hymenal notch" during the victim's genital exam, and explained that "[s]exual abuse is generally the-one of the only things that will cause [a hymenal notch], especially in the position where [it was.]" Id. She then testified "her findings were consistent with abuse, though not necessarily by defendant." Id . This causal link established that the expert opinion testimony was based on a proper foundation; and the expert's "specialized knowledge in pediatrics and child physical and sexual abuse[ ]" assisted the jury to understand the evidence or determine a fact in issue. Id. , 361 N.C. at 96-97, 637 S.E.2d at 521.
Defendant relies on State v. Ewell , 168 N.C. App. 98, 606 S.E.2d 914 (2005), for the proposition that contraction of a sexually transmitted disease is not sufficient physical evidence to provide a foundation supporting an expert's testimony that an individual had been sexually abused. See Ewell , 168 N.C. App. at 105, 606 S.E.2d at 919. In that instance, concerning the disease Trichomonas , the expert testified "sexual intercourse was not the only path of the disease's transmission[.]"Id . No other physical evidence was introduced, and this Court determined that the admission of the expert's testimony that "it was probable that [the minor] was a victim of sexual abuse" was error. Id .
By contrast, the expert testimony in the present case differs in an important respect: the expert testified that the sexually transmitted infection contracted by Kerry is not found in a child of her age absent sexual contact.[3] The present case is more akin to Hammet than Ewell .
In Hammet , the foundational burden was satisfied with the victim's history and a physical finding that is almost exclusively a result of sexual abuse. 361 N.C. at 96-97, 637 S.E.2d at 521. There, the victim suffered a "hymenal notch" that was, as explained by the expert, a result of sexual trauma and abuse. Id. In the present case, the expert testified that the victim suffered a chlamydia infection that is exclusively transmitted to girls of her age via sexual contact. See also State v. Carroll , 235 N.C. App. 218, 763 S.E.2d 339, *4 (2014) (unpublished opinion) (including a chlamydia infection among the physical evidence in support of a diagnosis of sexual abuse). Thus, evidence of a chlamydia infection in a child of Kerry's age provides the physical evidence necessary to establish an adequate foundation.
With an adequate foundation, expert opinion testimony that sexual abuse has occurred is admissible. As in Hammet , the expert in the case at bar testified that her opinion was based on a full medical evaluation, including the "interlocking factors" of the victim's history and accompanying physical evidence.
Accordingly, we conclude it was not error for the trial court to allow Dr. Thomas-Taylor's testimony that Kerry had been sexually abused.
B. Plain Error
Defendant also argues that if the issue was not preserved below, the admission of the testimony amounts to plain error. Because we conclude there was no error in the admission of the testimony, it is not necessary to further address defendant's plain error argument.
C. Ineffective Assistance of Counsel
Lastly, defendant argues that, to the extent he waived appellate review of the expert testimony or this Court found there to be error that did not amount to plain error, his counsel was ineffective. We disagree.
To prevail on a claim of ineffective assistance of counsel, a defendant must first show that his counsel's performance was deficient and then that counsel's deficient performance prejudiced his defense. Deficient performance may be established by showing that counsel's representation fell below an objective standard of reasonableness. Generally, to establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.
State v. Allen , 360 N.C. 297, 316, 626 S.E.2d 271, 286 (citations and quotation marks omitted), cert. denied , 549 U.S. 867, 166 L.Ed. 2d 116 (2006).
Given that the admission of the testimony was not error, defendant cannot show that his counsel's performance was deficient or that he has been prejudiced. Accordingly, defendant's ineffective assistance of counsel argument is overruled.
III. Conclusion
For the foregoing reasons, we conclude there was no error in the admission of the expert opinion testimony below. Because there was no error, defendant's contingent arguments also fail.
NO ERROR.
Report per Rule 30(e).
Judges McCULLOUGH and INMAN concur.
Judge Douglas McCullough concurred in this opinion prior to 24 April 2017.

The pseudonym used by the parties throughout is used in this opinion to protect the identity of the juvenile.

The primary issue concerned chain-of-custody; apparently, LabCorp had deleted those records prior to trial as part of its routine practices.

Also distinguishing Ewell from the present case is the fact that the Court in Ewell noted that the defendant did not test positive for the sexually transmitted disease found on the alleged victim. Here, the defendant was diagnosed with the same disease found on the alleged victim.